THIS OPINION IS A
PRECEDENT OF THE T.T.A.B.

Hearing: November 12, 2009          Mailed:  April 14, 2010

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Edwards Lifesciences Corporation
v.
VigiLanz Corporation

_____

Opposition No. 91154210
to application Serial No. 76302366
filed on August 20, 2001

_____

Robyn L. Phillips and Richard C. Gilmore of Workman Nydegger for Edwards Lifesciences Corporation.

Elizabeth C. Buckingham and Heather D. Redmond of Dorsey & Whitney LLP for VigiLanz Corporation.

_____

Before Bergsman, Wellington and Ritchie, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

VigiLanz Corporation ("applicant") filed an intent-to-use application for the mark VIGILANZ, in standard character form, for "near real-time computer monitoring system comprised of a software application and database that anticipates and detects possible adverse drug events, and alerts healthcare providers to adverse drug events," in Class 9.

Edwards Lifesciences Corporation ("opposer") opposed the registration of applicant's mark on the ground of priority of use and likelihood of confusion under Section

2(d) of the Trademark Act of 1946, 15 U.S.C. §1052(d).
Specifically, opposer alleged that it is the owner of a
registration for the mark VIGILANCE, in typed drawing form,
for "heart monitors," in Class 10 and that the registration
of applicant's mark VIGILANZ for computer monitoring systems
in the field of adverse drug events so resembles opposer's
registered mark as to be likely to cause confusion.[1]

Applicant denied the salient allegations in the notice
of opposition.

## Evidentiary Issue

A.    Testimony of Dr. Edward Finegan.

Opposer proffered the expert testimony of Dr. Finegan,
a linguist, regarding the pronunciation of applicant's mark.
Applicant objected to the admissibility of Dr. Finegan's
testimony on the ground that it is not helpful to the trier
of fact.  Dr. Finegan's testimony is admissible.  It is
relevant.  That Dr. Finegan's testimony may have little
probative value is no reason to strike it.  Therefore,
applicant's objection to Dr. Finegan's testimony is
overruled.

Having overruled applicant's objection, we hasten to
add that applicant is correct in asserting that Dr.

---

[1] Registration No. 1715415, issued September 15, 1992; Sections 8
and 15 affidavits accepted and acknowledged; renewed.  Opposer
also pleaded a dilution claim but withdrew it during the
prosecution of the proceeding.

2

Finegan's testimony has little probative value. First, it is well-settled that there is no single "correct" pronunciation of a trademark that is not a common English word because it is impossible to predict how the public will pronounce a particular mark. *Central Industries Inc. v. Spartan Chemical Co. Inc.*, 77 USPQ2d 1698, 1701 (TTAB 2006) (acknowledging that "there is no correct pronunciation of a trademark" and finding ISHINE likely to be confused with ICE SHINE, both for floor-finishing preparations). Second, the Board is responsible for determining whether the marks are similar, and we will not substitute the opinion of a witness, even an expert witness, for our evaluation of the facts. *Fisons Ltd. v. UAD Laboratories, Inc.*, 219 USPQ 661, 663 (TTAB 1983). However, "absent a competently designed and executed survey of a cross-section of customers and prospective customers of the products or services involved, the deciding tribunal must make its own subjective evaluation of what the average consumer will perceive the mark to be as he encounters them in the actual or hypothetical … marketing arena." *The Mennen Company v. Yamanouchi Pharmaceutical Co., Ltd.*, 203 USPQ 302, 305 (TTAB 1979); *Ferro Corp. v. Nicofibers, Inc.*, 196 USPQ 41, 45 (TTAB 1977) ("understanding of the marks must be determined in light of the relevant purchasing sector and not that of linguistic experts or those familiar with the meaning or

derivation of words"); *see also Anheuser-Busch Inc. v. Holt,* 92 USPQ2d 1101, 1106 (TTAB 2009).

B.    Improper designation of confidential information.

The stipulated protective order applicable in this proceeding covers information that "may constitute trade secret, confidential research, development, or otherwise confidential commercial information within the meaning of Fed.R.Civ.P. 26(c) and 37 C.F.R. §2.120." The order provided for the following two levels of protection:

1.    Confidential material is protected from public access; and,

2.    Trade secret/commercially sensitive material may be limited to attorneys and experts.

Fed.R.Civ.P. 26(c)(7) protects confidential, trade secret, and commercially sensitive information by allowing a party to limit the access to trade secret or other confidential information or by permitting the information to be revealed only in a designated way. The Advisory Committee Notes to the 1970 Amendment explain that the Rule does not provide complete immunity against disclosure; rather, in each case, the need for privacy must be weighed against the need for disclosure. Accordingly, information that is confidential or that imparts private information may require a different level of protection than information

that may be considered a trade secret or commercially sensitive.[2]

During the trial, the parties improperly designated testimony and exhibits as "Confidential Attorneys' Eyes Only." For example, Exhibits 6 and 9 in David Snider's testimony deposition are user manuals for opposer's heart monitors and they were designated as "Confidential Attorneys' Eyes Only."[3] It is inconceivable that user manuals distributed to opposer's purchasers could be confidential documents. To that end, we note that neither document contains a warning or legend advising users that the manuals contain trade secrets and should be kept in a secure location.

Other examples of improperly designated testimony are excerpts from the discovery depositions of Adam Klass, Patrick Kullmann and David Goldsteen which were designated as "Confidential Attorneys' Eyes Only" for no apparent reason (*e.g.,* how applicant's mark VIGILANZ was selected, the products on which applicant intended to use its mark, to whom applicant makes its initial sales contacts).

---

[2] A "trade secret" is defined as "a formula, process, device, or other business information that is kept confidential to maintain an advantage over competitors." In essence, a "trade secret" derives its value "from not being generally known or readily ascertainable by others who can obtain economic value from its disclosure or use." Black's Law Dictionary (8th ed. 2004).

[3] We find it ironic that opposer has asked us to find that its mark is famous (*i.e.,* the epitome of extensive public recognition and renown), yet its user manuals are designated as trade secrets comprising commercially sensitive information.

Because of the overdesignation of testimony and evidence by the parties, it is not clear to us what is intended to be truly "Confidential" and "Confidential Attorney's Eyes Only." Therefore, in rendering our decision, we will not be bound by the parties' designation. Board proceedings are designed to be publicly available and the improper designation of materials as confidential thwarts that intention. It is more difficult to make findings of fact, apply the facts to the law, and write decisions that make sense when the facts may not be discussed. The Board needs to be able to discuss the evidence of record, unless there is an overriding need for confidentiality, so that the parties and a reviewing court will know the basis of the Board's decisions. Therefore, in this opinion, we will treat only testimony and evidence that is truly confidential and commercially sensitive as confidential. Further, while sales figures, advertising expenditures and similar information are often designated in Board cases as confidential, in this case, where such figures appear in evidentiary submissions designated as confidential but appear elsewhere in publicly available documents or in submissions not designated as confidential, we will refer to such figures, as necessary, in this opinion.

## The Record

By rule, the record includes applicant's application file and the pleadings. Trademark Rule 2.122(b), 37 CFR §2.122(b). In addition, the parties introduced the following testimony and evidence:

A.   Opposer's evidence.

1.   Notice of reliance on a copy of opposer's pleaded registration prepared and issued by the U.S. Patent and Trademark Office showing both the current status of and current title to the registration.

2.   Notice of reliance on copies of abstracts from seven printed publications referencing opposer's VIGILANCE trademark.

3.   Notice of reliance on the Dictionary of Medicine (English to German), compiled by J. Nöhring, p. 689 (1984) to show that "vigilanz" is the German word for "vigilance."

4.   Notice of reliance on excerpts from the discovery deposition of Adam Klass, applicant's Chief Technology Officer, with attached exhibits 15, 16, and 17.

5.   Notice of reliance on excerpts from the discovery deposition of Patrick Kullmann, applicant's former Vice President of Sales and Marketing, with attached exhibits 4, 12, 14, and 18-21.

6.   Notice of reliance on excerpts from the discovery deposition of Dr. David S. Goldsteen, applicant's Chairman

and CEO, with attached exhibits 3, 10, 11, 13, 18, 20 and 22.

7. Notices of reliance on applicant's answers to interrogatory Nos. 2, 3, 5, 6, 7, 8, 12, 13, 15, 20, 22, 26, 27, 42, 43, 49 and 51.

8. Notice of reliance on applicant's answers to requests for admission Nos. 22, 24, 39, 45, 69, 70, 77, 197, 258-276, 279-282, 285-300 and 303-304 with attached exhibits.

9. Notice of reliance on official records of the U.S. Patent and Trademark Office, namely portions of the file contents from Opposition No. 91150468, portions of the file contents from opposer's pleaded registration, U.S. Patent No. 6993402 and U.S. Patent Application Nos. 2008/00004906 A1 and 2008/0074715 A1.

10. Testimony deposition of David K. Snider, opposer's Senior Product Manager, with attached exhibits.

11. Testimony deposition of Dr. Edward Finegan, Ph.D., an expert on linguistics, with attached exhibits.

B. Applicant's evidence.

1. Notice of reliance on seven third-party registrations and one application for marks including the

words "vigilant," "vigilance" or "vigilan" for products and/or services in the medical field.[4]

2. Notice of reliance on the discovery deposition of Dr. David S. Goldsteen in accordance with Trademark Rule 2.120(j)(4) purportedly to explain incomplete or misleading excerpts designated by opposer.

3. Notice of reliance on the discovery deposition of Patrick Kullmann pursuant to a stipulation of the parties in accordance with Trademark Rule 2.120(j)(2).

4. Notice of reliance on the discovery deposition of Adam Klass in accordance with Trademark Rule 2.120(j)(4) purportedly to explain incomplete or misleading excerpts designated by opposer.

5. Notice of reliance on the discovery deposition of David K. Snider, with attached exhibits.

6. Testimony deposition of Dr. David S. Goldsteen with attached exhibits.

The Parties' Marks and Products

A. <u>Opposer</u>

Opposer uses the mark VIGILANCE to identify heart monitors. The VIGILANCE heart monitors measure "hemodynamic parameters in a patient, including things like cardiac output, blood temperature, pressures and volumes that

---

[4] An application has "no probative value other than as evidence that the application was filed." *In re Phillips-Van Heusen Corp.,* 63 USPQ2d 1047, 1049 n.4 (TTAB 2002).

reflect the - - the performance of the heart and lungs and vascular system."[5] VIGILANCE monitors "enable clinicians to assess a patient's heart function, balance their oxygenation and make treatment decisions if a patient's hemodynamic balance is compromised."[6]

The monitor is designed for use with a catheter that measures cardiac output.[7] The monitor is connected to the catheter which is placed in the pulmonary artery for right heart and pulmonary hemodynamic measurements.[8]

> The Vigilance monitor measures cardiac output continuously by injecting small pulses of electrical power into the blood and recording the corresponding blood temperature changes via the catheter. The software based CCO [continuous cardiac output] algorithm within the monitor converts these power and blood temperature measurements into an estimate of cardiac output.[9]

The VIGILANCE monitor also has the capability to connect with other peripheral devices such as electronic medical records and bedside monitors.[10]

---

[5] Snider Testimony Dep., p. 55 and Exhibits 6 and 9 (User manuals); Snider Discovery Dep., p. 32. "Hemodynamic" means "relating to the physical aspects of the blood circulation." Stedman's Medical Dictionary (27th ed. 2000). "Cardiac output" is the "volume of blood ejected per minute from the heart into systemic circulation." Snider Testimony Dep., Exhibit 9.
[6] Snider Testimony Dep., Exhibit 42.
[7] Snider Testimony Dep., pp. 55-56 and Exhibits 6 and 9; Snider Discovery Dep., p. 32.
[8] Snider Testimony Dep., Exhibit 8, p. 7 (a 501(k) Notification filed with the FDA); see also Snider Testimony Dep., p. 38.
[9] Snider Testimony Dep., Exhibit 8, p. 4; see also Snider Testimony Dep., p. 39.
[10] Snider Testimony Dep., pp. 27, 39, 61-63.

The "*Vigilance®* Monitor is for use only as an adjunct in patient assessment."[11]  For example, it may be used to monitor the effect of a drug treatment.

> So, for example, if you have a situation where a drug is delivered to the patient and the drug has an adverse effect on that patient, where it be, you know, for example, it might be a vaso active drug that causes a patient's vessels to open wide and then blood pressure to fall, that would be directly -- that information would be directly indicated on the Vigilance monitor and we would see it as impacted cardiac output, as it impacted end diastolic volume, pressures within the heart and the - - and the major vessels of the body.
> So when you - - you know, you look at adverse events that occur to the patient, they are reflected in physiology, and then the Vigilance monitor would pick those up and then could alert the clinician with an audible alert, a visual alert as to what the circumstances and conditions are.[12]

The VIGILANCE heart monitors are designed for use in critical care settings such as operating rooms, intensive care units, recovery rooms, hospital emergency rooms and burn units.[13]  In fact, opposer promotes the VIGILANCE heart monitor at trade shows directed to critical care clinicians: the Society of Critical Care Medicine; the American Association of Critical Care Nurses; the American Society of

---

[11] Snider Testimony Dep., Exhibits 6 and 9, p. 2-1 (User Manuals).
[12] Snider Testimony Dep., p. 41; *see also* Snider Testimony Dep., pp. 60-61; Snider Discovery Dep., p. 35.
[13] Snider Testimony Dep., Exhibits 6 and 9, p. 1-1, and Exhibit 21, p. 1-3 (User manual); Snider Discovery Dep., pp. 41 and 80.

Anesthesiologists; the American College of Chest Physicians; the American College of Emergency Physicians and the American Association of Emergency Room Nurses.[14]  It does not sell the heart monitors to pharmacies.[15]

The "list price" of the VIGILANCE monitor is approximately $14,000,[16] however, when the monitors are actually sold, the price is subject to negotiation.[17]  A typical sale involves multiple monitors.[18]

The sales process starts with the end-user.[19]

> A.   The initial contact is by the direct sales rep to the end user or the manager in the department who would be the end user.  And that sales presentation and that sales contact is really focused mostly on features and benefits, what does the device do, how does it operate, what's its clinical application. And usually that process is focused on getting an agreement to do a trial period.  So those first contacts with the sales rep and then - - and the and the (sic) end user are very much practical kind of processes.
>
> If at the end of the - - the trial period, which could last for 30 days or sometimes as much as six weeks, the end user will make a decision and determine whether or not they want to buy the system or don't want to buy the system.

---

[14] Snider Testimony Dep., pp. 76, 129 and Exhibit 33.
[15] Snider Discovery Dep., p. 41; Snider Discovery Dep., p. 80.
[16] Snider Discovery Dep., p. 44.
[17] Snider Discovery Dep., p. 45.
[18] Snider Discovery Dep., p. 46.
[19] Snider Discovery Dep., pp. 59-60.

At that point

Q.    Is that decision to buy or not buy, the process at that level the ultimate purchasing decision?

A.    No, no.  That's the decision for that department.  And particularly for capital equipment, there's a whole other set of hurdles that have to be overcome.

So from that point, once the department says this is the kind of system we would like to use and want to use, then that's taken to the next level, which is usually that capital equipment buying group or buying committee that has representatives on it from - - a core group of representatives but also may include representatives from areas that have specific interest in those things.

So for example, if - - the core group in a hospital may include purchasing, administration, biomed, somebody from nursing service and the medical staff.  But then if this is a unit that's specific to the operating room, then the operating room supervisor will become part of that committee for a period of time.

And the thing that's interesting about this whole process for our sales representatives is as it goes from level to level, from the user level to the purchasing level for capital equipment and, if the PO [purchaser order] is big enough, to the next level, which would be an administrator, the hospital administrator or the hospital CFO, these people are more and more divorced from actual contact with the product so they don't draw

> connections between, oh, this is the monitor we call Vigilance.

>      *     *     *

Q. Can you describe in a little bit more detail the level of contact that each of these levels has with the product and the sales force marketing the Vigilance monitors?

A. Sure. At the department level where they're doing the clinical evaluation, they have very close contact with the sales representative and they have hands-on experience with the monitor, including the monitor and all of the - - op manuals, operations manuals and so on.

When you get to the next level, the purchasing committee, typically their interface, the sales representative is not involved in presenting usually to the - - to the purchasing committee. Their review is limited to a paper file, which could include literature and - - descriptions and internal forms identifying it. And then at that point, once you get up to the administrative level, he's probably not only never seen a monitor, he probably has no idea what the monitor's used for. He's relying only on the paper trail that's been developed during this purchasing process all the way up until, you know, he - - he really looks at, okay, we're going to spend X dollars on this and what's the return on investment of that X dollar. So his connection between what he sees on paper and what's actually being used down in the department is pretty tenuous.[20]

---

[20] Snider Testimony Dep., pp. 99-103; *see also* Snider Testimony Dep., pp. 85-86; Snider Discovery Dep., pp. 47-58.

"[T]he sales cycle for Vigilance monitors can be … long.  It can be as much as six months.  Usually between three and six months, that process is done, depending on the size of the sale."[21]

After a sale is completed and the monitors are installed, opposer's sales representatives will make a follow-up visit "to ask questions or to answer questions, to make sure things are operating appropriately."[22]  Opposer also provides technical services for repair, if necessary.[23]

B.  Applicant

Applicant is seeking to register the mark VIGILANZ for a "near real-time computer monitoring system comprised of a software application and database that anticipates and detects possible adverse drug events, and alerts healthcare providers to adverse drug events."  "An adverse drug event is a negative outcome that causes harm to a patient during a therapeutic treatment of a patient with a specific medication."[24]  Applicant's system is a software application that analyzes data from different sources within a hospital by applying a large rule set "to identify pairs, drugs and

---

[21] Snider Discovery Dep., p. 56.
[22] Snider Discovery Dep., p. 59.
[23] Snider Discovery Dep., p. 59.
[24] Goldsteen Testimony Dep., p. 10; *see also* Snider Discovery Dep., p. 33 ("an adverse drug event is one in which there may be an unexpected or an untoward reaction to a specific drug or the combination of drugs").

lab pairs, which could potentially lead to an adverse drug event."[25]

> A rule engine is software that imbeds rules that can be written by the user or by [applicant]. Those rules identify specific labs, specific pharmaceuticals, as well as associations such as additional labs and pharmaceuticals. And the rule engine then runs those rules against the database to see if there's any match. If there's a match against any abnormal lab within the system, the solution then activates or begins running, watching to see if that's a situation that will ultimately be addressed or not addressed.[26]

Applicant's VIGILANZ system receives data from the hospital's admission, diagnosis and transfer system, the lab system, and the pharmacy system.[27] If a patient has an abnormal lab report and that patient has been prescribed a drug for which there is a rule, applicant's VIGILANZ system monitors the patient's records to make sure that appropriate action is taken.[28]

Applicant's VIGILANZ system is designed for the pharmacy because pharmacists are the primary hospital staff responsible for monitoring adverse drug events.[29]

---

[25] Goldsteen Testimony Dep., p. 9. "Rules" are "[t]he programmed criteria which an on-line, real-time system uses to make operating decisions." Computer Dictionary, p. 473 (3rd ed. 1984). See also The Computer Glossary, p. 343 (7th ed. 1995) ("a set of conditions or standards which have been agreed upon").

[26] Goldsteen Testimony Dep., p. 14; see also Klass Discovery Dep. p. 88.

[27] Goldsteen Testimony Dep., p. 12.

[28] Goldsteen Testimony Dep., p. 17.

[29] Goldsteen Testimony Dep., pp. 19, 26; Goldsteen Discovery Dep., p. 79; Klass Discovery Dep., p. 36; Kullmann Discovery Dep., pp.

Applicant's system is not designed or marketed to physicians because physicians do not have "direct, day-to-day" responsibility for monitoring adverse drug events. According to Dr. Goldsteen, physicians rely on the pharmacy to monitor for adverse drug events.[30]

> Q. Was it also designed to target physicians?
>
> A. Not primarily because physicians would not be interested in receiving alerts for conflicts between what was in the pharmacy file and what the test lab results came by [sic]. As I recollect they wanted to delegate that to the pharmacist because the pharmacist is the chief medication safety person in a hospital as well as the chief distributor of medications.[31]

Applicant's advertising corroborates the testimony that applicant's system is designed for pharmacists by explaining how pharmacists interact directly with applicant's system and then contact appropriate staff. Kullmann Exhibit 21, an advertising flyer for applicant's system, states the following:

> PHARMACY
>
> · Real-time analysis and reporting – data is always at your fingertips
>
> · No data entry required

---

38, 43 ("This system, however, was virtually focused on the pharmacy").

[30] Goldsteen Testimony Dep., pp. 28-29, 56-57; Goldsteen Discovery Dep., p. 80.

[31] Kullmann Discovery Dep., p. 38; *see also* Kullmann Discovery Dep., p. 39.

> · Saves time by streamlining the
>   gathering of information
>
> MEDICAL STAFF
>
> · Enhances clinically relevant
>   pharmaceutical reports from
>   pharmacy
>
> · Improves overall communication
>   between the clinician and pharmacy

*See also* Opposer's notice of reliance on applicant's responses to opposer's request for admissions Exhibit 1 (an excerpt from applicant's website explaining that pharmacists interact directly with applicant's system and that the pharmacists notify physicians of the problems), Exhibit 6 (*Hospital Pharmacy Regulation Report* newsletter explaining that "an alert will notify the pharmacist to the problem"), and Exhibit 15 (an excerpt from applicant's website with scenarios of how applicant's system works in which the pharmacist receives the alerts and then notifies other appropriate staff).

Every facility that licenses applicant's system must pay a one-time $47,000 installation fee in addition to a yearly license. Applicant charges hospitals based on the number of beds; for example, a 150-bed hospital would spend about $46,000 per year to license applicant's system.[32]

---

[32] Goldsteen Testimony Dep., Exhibit 59 (*Hospital Pharmacy Regulation Report*, November 2005, a newsletter); *see also* Goldsteen Testimony Dep., pp. 32-33.

Applicant relies on direct sales contacts, its website and trade shows to market its system.[33] Applicant's sales process begins with the pharmacy department at a hospital.[34] Generally, the director of the pharmacy or a pharmaceutical staff person has been directed to find a method to monitor patients for adverse drug events.[35]

> The pharmacy is the one that was either going to say no or say a conditional yes with additional above approval because it was a pharmacy based system, it actually resided in the pharmacy, so they were the main drivers.[36]

Because applicant is licensing a software application, the information technology department will have a representative present to ensure that the system is compatible with the hospital's system and that the price is within reason.[37]

> Q.   Once initial contact has been made with a hospital, whether it be pharmacy personnel or IT personnel, how is that you have discussions or demonstrate the product for them? Can you tell us about that?
>
> A.   Generally, if they show interest, we recommend that they pull together a group of people to whom we will do an online demonstration.

---

[33] Kullmann Discovery Dep., pp. 56-56; Goldsteen Discovery Dep., pp. 137, 141 (applicant also has a manufacturer's representative); Goldsteen Testimony Dep., p. 34.
[34] Goldsteen Testimony Dep., p. 27; Goldsteen Discovery Dep., p. 50; Klass Discovery Dep., p. 123; Kullmann Discovery Dep., pp. 40-41, 43.
[35] Goldsteen Testimony Dep., p. 27; Klass Discovery Dep., p. 84.
[36] Kullmann Discovery Dep., p. 43.
[37] Goldsteen Testimony Dep., pp. 27-28; Goldsteen Discovery Dep., pp. 51, 155; Klass Discovery Dep., pp. 123-14.

> It's generally one or two
> pharmacists and one or perhaps two
> information technology people.  And
> we'll show them a full
> demonstration of our DPV product
> online, and they will decide
> whether they want to take that to
> the next level.

> Q.   And what would the next level be?

> A.   The next level would probably be
> pulling together some champions
> within the administrative area.
> Might be a vice president that the
> pharmacy director reports to in
> trying to help them prepare for
> championing the capital process
> when they put in for funding for
> the solution.[38]

The final approval for licensing applicant's system rests with the director of the hospital pharmacy, the Chief Operating Officer or the Chief Financial Officer.[39]  The sales cycle generally takes twelve to eighteen months.[40]

After the license is signed, applicant has extensive contacts with its licensees during the installation process.

> It's at that point we begin the
> installation process, where we have at-
> length discussions with the pharmacists
> and the IT staff as to both how the
> process is going to lay out time-wise,
> who the key people are that will be
> involved to work with us both on the IT
> side and the pharmacy side, what
> customization they may request in terms
> of adapting or adjusting, what rules

---

[38] Goldsteen Testimony Dep., pp. 29-30; *see also* Kullmann Discovery Dep., pp. 40-41, 43-44.
[39] Goldsteen Testimony Dep., p. 30; Goldsteen Discovery Dep., p. 160.
[40] Goldsteen Testimony Dep., p. 33; Goldsteen Discovery Dep., p. 163.

> they may want. And then it's the
> education process to teach them how to
> use the solution in terms of optimizing
> their purchase of the license.[41]

The system will reside on a server located within the hospital's firewall or it will be supplied by applicant through a remote data center.[42]

Applicant attends trade shows sponsored by the American Society of Health System Pharmacists.[43]

## Standing

Because opposer has properly made its pleaded registration of record, opposer has established its standing. *Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

## Priority

Because opposer's pleaded registration is of record, Section 2(d) priority is not an issue in this case as to the mark and the product covered by the registration. *King Candy Co. v. Eunice King's Kitchen, Inc.,* 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

---

[41] Goldsteen Testimony Dep., p. 39.
[42] Goldsteen Discovery Dep., p. 59.
[43] Goldsteen Testimony Dep., pp. 34, 35-36; Goldsteen Discovery Dep., p. 185.

<u>Likelihood of Confusion</u>

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003).

A.   <u>The fame of opposer's marks.</u>

This *du Pont* factor requires us to consider the fame of opposer's mark.  Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use.  A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton,* 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Fame may be measured indirectly by the volume of sales and advertising expenditures of the goods and services identified by the marks at issue, "by the length of time those indicia of commercial awareness have been evident," widespread critical assessments and through notice by independent sources of the products identified by the marks,

as well as the general reputation of the products and services. *Bose Corp. v. QSC Audio Products Inc.,* 63 USPQ2d at 1305-1306 and 1309. Although raw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, raw numbers alone may be misleading. Some context in which to place raw statistics may be necessary (*e.g.,* the substantiality of the sales or advertising figures for comparable types of products or services). *Bose Corp. v. QSC Audio Products Inc.,* 63 USPQ2d at 1309.

Finally, because of the extreme deference that we accord a famous mark in terms of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC,* 82 USPQ2d 1901, 1904 (TTAB 2007).

Opposer has been using the mark VIGILANCE to identify heart monitors since 1990.[44] Opposer made of record the sales figures and advertising expenditures for its heart monitors. The sales and advertising figures were designated confidential – and they are truly appropriate matter for a confidential designation - so we may only refer to them in general terms. On their face, the sales figures appear to

---

[44] Snider Testimony Dep., p. 107.

be relatively large.  In that regard, opposer claims to have captured 75% of the heart monitor market.[45]

With respect to the advertising figures, they are not particularly impressive.  Furthermore, the problem that we have in assessing the effectiveness of the advertising expenditures is that there is no testimony or evidence regarding whether opposer's advertising expenditures are large or small vis-à-vis other comparable medical products.

Opposer has submitted references from medical journals to show that its VIGILANCE mark has achieved fame.  An article in an unidentified periodical, referred to "Vigilance … as the gold standard in this trial."[46]  Opposer also submitted abstracts from seven medical journals referencing the use of VIGILANCE heart monitors in clinical tests.  The abstracts were from *Anaesthesia, Journal of Clinical Monitoring, Clinical Intensive Care, Journal of Trauma*, a Japanese publication and a German publication. The articles have limited value in proving the fame of opposer's mark because they noted only opposer's heart

---

[45] Snider Testimony Dep., p. 76.  The testimony regarding applicant's market share was made in the context of the aforementioned "invasive" heart monitors (*i.e.*, those employing catheters to obtain the heart-monitoring data).  While the term "heart monitors" may include non-invasive heart monitors, we do not have evidence regarding opposer's market share in the broader category of heart monitors.  Thus, we can only conclude that opposer's "75%" market share is limited to the invasive-type heart monitors which, as explained infra, are used in critical care environments.
[46] Snider Testimony Dep., pp. 109-111 and Exhibit 27.

monitors as an instrument used in a particular study. They did not demonstrate recognition of the mark by the relevant purchasing public.

Although the medical journal articles are not sufficient to establish fame for the mark, as evidenced by opposer's long use of its mark and market success, we find that opposer has acquired niche market fame. That is, within critical care settings such as operating rooms, intensive care units, recovery rooms, hospital emergency rooms and burn units, the VIGILANCE mark has achieved a high level of renown.[47]

B.  <u>The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression</u>.

We now turn to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *In re E. I. du Pont De Nemours & Co.*, 177 USPQ at 567. In a particular case, any one of these means of comparison may be critical in finding the marks to be similar. *In re White Swan Ltd.*, 9 USPQ2d 1534, 1535 (TTAB 1988); *In re Lamson Oil Co.*, 6 USPQ2d 1041, 1042 (TTAB 1988). Opposer's registered mark is VIGILANCE and applicant's mark is VIGILANZ.

---

[47] As David Snider testified, outside the critical care setting the hospital administrators do not associate the VIGILANCE mark with any particular product. (Snider Testimony Dep., p. 101).

The marks are similar in appearance.  They both start with the letters V-I-G-I-L-A-N.  We find, therefore, that VIGILANZ bears a clear visual resemblance to VIGILANCE.

In terms of sound, we likewise find that there are clear similarities in the two marks.  Applicant's argument that "[t]he 'A-N-Z' at the end of the VIGILANZ mark is pronounced … differently from the "A-N-C-E" at the end of the VIGILANCE mark" is not persuasive.[48]

> We pronounce it "VigiLanz," with a soft G, a short A, and a hard Z.  The A is pronounced "chimpanzee," short A sound.[49]

Applicant's advertising and marketing materials do not feature a pronunciation guide.  As indicated in the discussion regarding Dr. Finegan's testimony, it is well-settled that there is no single correct pronunciation of a trademark that is not a common English word because it is impossible to predict how the public will pronounce a particular mark.  *Central Industries Inc. v. Spartan Chemical Co. Inc.,* 77 USPQ2d at 1701.  Because applicant's mark is similar in appearance to the familiar word "Vigilance," most consumers will associate VIGILANZ with VIGILANCE and pronounce VIGILANZ as "vigilance."  In addition, both marks start "vigil" and end with a syllable featuring "an."  In this regard, because applicant's product

---

[48] Applicant's Brief, pp. 29-30.
[49] Goldsteen Trial Testimony, p. 24.

is a monitoring sytem for detecting adverse drug events, it is likely that prospective purchasers and users of the system will see a connection between the name VIGILANZ and the purpose of the system, thereby associating the name with the word "Vigilance."  Moreover, even if applicant's argument regarding the pronunciation of its mark were correct, the pronunciation of the two marks is still similar to the extent that both marks start with "vigil."

In terms of connotation and commercial impression, consumers will perceive the marks as meaning "watchful." The word "vigilance" means "watchfulness."[50]  Likewise, VIGILANZ conveys the same meaning and commercial impression.

> Q.  Can you describe for me the circumstances in which the mark VigiLanz was conceived?
>
> A.  To the best of my recollection, I was trying to come up with a name that would reflect our goal of being an alert company in alerting to potential adverse drug events. The word vigilant came to mind.[51]
>
> *     *     *
>
> Q.  Dr. Goldsteen, does the mark VigiLanz owned by VigiLanz Corporation have any connotation?
>
> A.  Yes, vigil, the first five letters really means alert is truly what attracted us to that name.
>
> Q.  Do you, does it mean anything else?

---

[50] The Random House Dictionary of the English Language (Unabridged), p. 2121 (2nd ed. 1987).
[51] Goldsteen Discovery Dep., p. 28.

    A.    Not that I know of.

    Q.    Okay.  Does it relate to, would you
          agree that it has the connotation
          of being vigilant?

    A.    You know, that's in the ear of the
          beholder I guess.  But that was the
          intent that somebody would want to
          be alert, that it's a name that
          conveys a company that has a
          product that is alerting.[52]

The marks VIGILANCE and VIGILANZ suggest products that look or watch for specific clinical parameters.

In view of the foregoing, we find that the marks are similar.

C.    The similarity or dissimilarity and nature of the products described in the application and registration and likely-to-continue trade channels and classes of consumers.

In determining whether the goods are related, it is not necessary that the goods of the parties be similar or competitive in character to support a holding of likelihood of confusion; it is sufficient for such purposes that a party claiming damage establish that products are related in some manner and/or that conditions and activities surrounding marketing of these goods are such that they would or could be encountered by same persons under circumstances that could, because of similarities of marks used with them, give rise to the mistaken belief that they originate from or are in some way associated with the same

---

[52] Goldsteen Discovery Dep., pp. 74-75.

producer.  *Schering Corporation v. Alza Corporation,* 207 USPQ 504 (TTAB 1980); *Oxford Pendaflex Corporation v. Anixter Bros. Inc.,* 201 USPQ 851 (TTAB 1978).

Various points of similarity can undoubtedly be drawn between the products of the parties (*e.g.,* they are both used in the medical field, specifically in hospitals, *albeit* in different places within those hospitals, and they are both used to monitor aspects of patient care).  In fact, opposer's heart monitor may be used to monitor the effect of a drug treatment.  However, a finding that the goods are similar is not based on whether a general term or overarching relationship can be found to encompass them both.  *Harvey Hubbell Inc. v. Tokyo Seimitsu Co., Ltd.,* 188 USPQ 517, 520 (TTAB 1975) ("In determining whether products are identical or similar, the inquiry should be whether they appeal to the same market, not whether they resemble each other physically or whether a word can be found to describe the goods of the parties").

Despite the superficial similarities between the goods, we find that they are very different:  opposer's product is a monitor (with associated operating software), used in critical care settings such as operating rooms, intensive care units, recovery rooms, hospital emergency rooms and burn units to measure cardiac output while applicant's product is a computer monitoring system comprising software

and a database used by hospital pharmacies to analyze patient lab results and prescribed drugs to anticipate adverse drug events. Opposer simply has not satisfied its burden of proof of showing that the goods identified by the application are sufficiently related to heart monitors as to create a likely of confusion.

Opposer argues that the similarity of the goods must be determined based on the description of the goods in the application and that because the description of goods does not specify all of the capabilities of applicant's computer systems, we should not artificially limit applicant's goods in the likelihood of confusion analysis.[53]  We agree. However, applicant has submitted extrinsic evidence to demonstrate the meaning of its description of goods, not to restrict or limit the goods.  Where, as here, applicant's description of goods provides basic information, and the goods are of a technical nature, it is entirely appropriate to consider extrinsic evidence to determine the specific meaning of the description of goods.  *In re Trackmobile, Inc.,* 15 USPQ2d 1152, 1154 (TTAB 1990); *see also Pharmacia Inc. v. Asahi Medical Co., Ltd.,* 222 USPQ 84, 85-86 (TTAB 1984) (the Board must be concerned that the uses and meanings of technical or scientific terms in the description

---

[53] Opposer's Brief, p. 39.

of goods have been made clear to properly assess the
relationship between the goods).

> However, when there is a difference
> between the marks and the goods, or
> both, it is incumbent upon the plaintiff
> to persuade us that there is a
> reasonable likelihood of confusion * * *
> If the goods are different, the proof is
> perhaps more objective because then we
> are looking for concrete facts about the
> nature of the goods, their uses, the
> channels through which they reach their
> ultimate purchasers and users, the types
> of persons who buy them, and the
> marketing environment surrounding the
> sale of the goods of the parties.  In
> the many cases, some of these facts will
> be self-evident, a matter of common
> knowledge or matters to be presumed from
> the identifications of goods in
> opposer's registration and applicant's
> application. In other cases, however,
> the relationship between the parties'
> goods, particularly as that ultimate and
> the underlying subsidiary facts impinge
> upon the question of likelihood of
> confusion, is not readily apparent and
> some evidence is needed.

*Hyde Park Footwear Company, Inc. v. Hamphsire Designers,
Inc.,* 197 USPQ 639, 641-642 (TTAB 1977).

Thus, we find that applicant has distinguished its
computer system from opposer's heart monitors, whereas,
opposer has merely adduced testimony that applicant's
computer system could theoretically interface with opposer's
heart monitors.  The essence of opposer's argument is that
"[b]oth VIGILANCE® heart monitors and the VIGILANZ computer
systems are designed to be flexible enough to be used with a
variety of systems commonly used by healthcare facilities

because healthcare facilities often use different systems with various functions and capabilities."[54]  However, with respect to applicant's description of goods, we are only concerned with a computer system that monitors for adverse drug events.  The evidence is clear that opposer's heart monitors and applicant's computer systems are separate and distinct products that are not marketed to the same consumers.  Ultimately, purchasing decisions may be made by some of the same capital equipment purchasing committees in hospitals, *albeit* for their critical care and pharmacy departments.  However, the initial marketing and outreach efforts by the parties are to different prospective end users of the respective products.  Furthermore, as demonstrated by the facts of this case, the purchasing process is so attenuated and lengthy for both products that there is time for all involved to understand clearly and completely the vendors with whom they are dealing.  Opposer did not submit any evidence that persuades us that the description of goods in the application could reasonably encompass products that are related to opposer's heart monitors.[55]

---

[54] Opposer's Brief, p. 39.
[55] In analyzing the goods, the dissent focuses on the term "healthcare providers" in applicant's description of goods rather than on the product that is described.  The evidence is clear and unequivocal that the healthcare provider that uses applicant's computer system is the hospital pharmacy.

Opposer also argues that its heart monitors and applicant's computer monitoring system are complementary products used by the same healthcare providers to monitor information regarding patient health and to send alerts as appropriate. Moreover, opposer asserts that applicant's computer monitoring system can interface with opposer's heart monitor.

First, the evidence demonstrates that the two products are used by different personnel in the hospital. Opposer's monitors are used by the staff in critical care settings such as operating rooms, intensive care units, recovery rooms, hospital emergency rooms and burn units to measure cardiac output. Applicant's computer monitoring system is designed for and used by the hospital pharmacy.

Second, the two products are not complementary products. There is no testimony or evidence demonstrating that the two products would be bought and/or used together by the same personnel in the hospital. Thus, despite the fact that a patient may be simultaneously monitored by applicant's system and opposer's heart monitor, the same hospital staff are not interacting with the two products.

Finally, the evidence regarding the complementary nature of opposer's heart monitors and applicant's computer

33

system is theoretical, not practical.[56] Dr. Goldsteen testified that the issue of who receives alerts from applicant's system and how the alerts are received is a workflow issue, not a customization issue.[57] The focus of applicant's system is analyzing lab results and medicines, not monitoring vital signs.[58]

Q. Does the VigiLanz product use data from devices that are used to monitor the physiologic response to medication?

A. So far not.

Q. Could it?

A. It could take output, for example, for vital signs, for blood pressure, for say oximetries, temperature. So far we, we haven't, we're kind of a long ways from that.

Q. So would that include gathering information from devices that are used to, for hemodynamic monitoring devices?

A. Generally there's not a market need, there's not a call for that. And the reason being is those devices alert immediately in the people that it needs to alert that are in the immediate vicinity. So there isn't a, a hidden process going on. Blood pressure drops, you know, the blood pressure cuff goes up, there's a loud beep. A person goes into dysrhythmia, the

---

[56] Klass Discovery Dep., pp. 93-95; Goldsteen Testimony Dep., pp.49-51 ("Theoretically, it is technically possible" for applicant's system to monitor and analyze physiological data).
[57] Goldsteen Testimony Dep., p. 42.
[58] Klass Discovery Dep., p. 96.

> monitor alerts immediately. So there isn't a market call necessarily. The potential would only be if, if we wanted to try to tie that drop in blood pressure to a medication that the patient had been given at some earlier time.
>
> Q. Right. And it is possible to do if it's a result of the medication, is that correct?
>
> A. It depends on the system. It depends on if it's a stand alone system that's not integrated into the hospital's electronic record, no.[59]
>
> Q. But if it was a system that's integrated into the hospital's electronic system, the VigiLanz product could –
>
> A. We could theoretically create an interface with that and use that data.[60]

In analyzing the channels of trade and classes of consumers, we must keep in mind that "although the two parties conduct business not only in the same fields but also with some of the same companies, the mere purchase of goods and services of both parties by the same institution does not, by itself, establish similarity of trade channels or overlap of customers. (Internal citation omitted). The likelihood of confusion must be shown to exist not in a purchasing *institution*, but in 'a customer or purchaser.'"

---

[59] Applicant's system is an independent system from the hospital system. (Goldsteen Discovery Dep., p. 85; Goldsteen Testimony Dep., p. 13).
[60] Goldsteen Discovery Dep., pp. 91-92.

35

*Electronic Design & Sales v. Electronic Data Systems*, 954 F.2d 713, 21 USPQ2d 1388, 1391 (Fed. Cir. 1992) (Emphasis in the original).

Although opposer's heart monitors and applicant's computer monitoring system are both used in hospitals to monitor some aspect of patient care, this is the most that can be said in support of their similarity.  The decision to purchase opposer's heart monitors is made by the staff in the critical care section of a hospital.  David Snider, opposer's Senior Product Manager, testified that opposer's initial contact is with the end user and that "the end user will make a decision and determine whether or not they want to buy the system."[61]  In fact, Mr. Snider noted that as the decision moves to the purchasing committee for approval, the people involved have little knowledge about the product.

> [T]hese people are more and more divorced from actual contact with the product so they don't draw connections between, oh, this is the monitor we call Vigilance.[62]

Their focus is on the return on investment.

On the other hand, applicant markets its computer monitoring system to the hospital pharmacy.  The testimony of applicant's witnesses, Adam Klass, Patrick Kullmann, and

---

[61] Snider Testimony Dep., pp. 99-100.
[62] Snider Testimony Dep., p. 101.

Dr. David Goldsteen, is unequivocal and uncontroverted in that respect.

There is no evidence that opposer's heart monitors are marketed to the pharmacy or that applicant's computer monitoring system is marketed to physicians, nurses, or administrators in critical care settings. Furthermore, the parties attend trade shows aimed at different health care staff.

To support its position that the goods at issue move in the same channels of trade, opposer argues that both parties attend trade shows and market over the Internet and through direct marketing. While true, opposer ignores the fact that the evidence shows that opposer markets to the staff of critical care units while applicant markets to hospital pharmacies. Again, the burden was on opposer to submit evidence to the contrary.

We are left with a record showing that the same people do not encounter the marks and products; or, if they did, they would do so only in the context of lengthy sales processes leaving no room for misunderstanding about the sources of the respective products. Opposer counters this fact by arguing that because applicant did not restrict its description of goods to computer monitoring systems designed and sold to hospital pharmacies, the Board must interpret

the description of goods to include doctors, nurses and other relevant healthcare providers.

Opposer has properly recited the law that where there are no restrictions, the trade channels and classes of consumers are determined by the description of goods. Because applicant's description of goods is not restricted to hospital pharmacies, in fact, it recites healthcare providers, it must be presumed that applicant's computer monitoring system for anticipating and detecting adverse drug events and sending alerts to healthcare providers moves through all channels of trade suitable for that type of product. The same holds true for opposer's heart monitors. The determinative question is whether there is an overlap in the ordinary and usual trade channels for applicant's identified computer monitoring system for anticipating and detecting adverse drug events and sending alerts to healthcare providers and opposer's identified heart monitors. *Triumph Machinery v. Kentmaster Manufacturing*, 1 USPQ2d 1826, 1828 (TTAB 1987). There is no dispute that opposer's heart monitors are designed for use in critical care settings such as operating rooms, intensive care units, recovery rooms, hospital emergency rooms and burn units and not pharmacies.[63] With respect to applicant's product, we

---

[63] During oral argument, opposer explained that its heart monitors are invasive devices that require a catheter. However, because opposer's description of goods is not restricted, we must

are persuaded by the weight of substantial evidence that applicant's product is a highly specialized computer system which, by its very nature, is designed for and used primarily by hospital pharmacists.  Applicant has shown through the testimony of Adam Klass, Patrick Kullmann and Dr. David Goldsteen that hospital pharmacists, not physicians, are responsible for monitoring for adverse drug events and that, in fact, physicians rely on pharmacists to monitor patients for adverse drug events.  Furthermore, Patrick Kullmann and Dr. Goldsteen specifically testified regarding why physicians were unsuited to receive alerts from applicant's system.  Opposer did not counter this testimony with contrary evidence.  We reiterate that we consider this extrinsic evidence regarding the description of goods for the sole purpose of understanding the nature of the goods.  *In re Trackmobile, Inc.*, 15 USPQ2d at 1154; *Pharmacia Inc. v. Asahi Medical Co., Ltd.*, 222 USPQ at 85-86.

In view of the foregoing and in construing applicant's description of goods in a manner most favorable to opposer (*see CTS Corp. v. Cronstoms Manufacturing*, *Inc.,* 515 F.2d

---

interpret "heart monitors" to include all heart monitors, such as heart monitors that a physician or nurse in a doctor's office would use or even a heart monitor connected to an exercise machine at a health club.  Nevertheless, the breadth of the term heart monitors does not make the goods any more related.  To the contrary, the physicians and staff in a doctor's office would be even less likely to have any contact with applicant's goods.

780, 185 USPQ 773, 774 (CCPA 1975)), we find that opposer's heart monitors and applicant's "near real-time computer monitoring system comprised of a software application and database that anticipates and detects possible adverse drug events, and alerts healthcare providers to adverse drug events" are not related products and that they move in different channels of trade to different classes of consumers.

D.   The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.

Just based on the products involved in this proceeding, one would expect that all of the purchasers would exercise a high degree of care when making their purchasing decision. Nothing in the record is to the contrary. Both products are expensive. Opposer's VIGILANCE monitor has a list price of $14,000[64] with a typical sale involving multiple monitors.[65] Licensing applicant's computer system involves a one-time $47,000 installation fee in addition to a yearly license which for a 150-bed hospital would be about $46,000 per year.[66] Furthermore, the testimony proffered by both parties confirms that opposer's heart monitors are purchased and applicant's computer system is licensed only by

---

[64] Snider Discovery Dep., p. 44.
[65] Snider Discovery Dep., p. 46.
[66] Goldsteen Testimony Dep., Exhibit 59 (*Hospital Pharmacy Regulation Report*, November 2005, a newsletter); *see also* Goldsteen Testimony Dep., pp. 32-33.

experienced personnel after significant study and negotiations. The sales cycle for opposer's heart monitors is between three to six months while the sales cycle for applicant's computer system is twelve to eighteen months. Thus, we find that opposer's heart monitors and applicant's computer system are purchased and licensed only after careful consideration by persons who are highly knowledgeable about the products.

E.    Instances of actual confusion.

There have been no reported instances of actual confusion.[67]  Opposer argues, however, that since applicant has only licensed two systems, there has only been *de minimis* opportunity for confusion.  Applicant argues to the contrary that the parties concurrently have been using their marks since March 2001.

Although applicant has only licensed two systems, it has given numerous demonstrations.

> Q.    [H]ow many Web demos have you
>        given?
>
>              *     *     *
>
> A.    Too many to count, yeah.[68]
>
> Q.    And can you give me an idea of how
>        many such product demonstrations
>        VigiLanz Corporation has put on in
>        its history?

---

[67] Snider Discovery Dep., p. 83; Goldsteen Testimony Dep., p. 26.
[68] Klass Discovery Dep., p. 84.

A. My best guess would be 3- to 400.[69]

Furthermore, both parties maintain a presence on the Internet.[70] Dr. Goldsteen testified that applicant's marketing efforts "have been more along the process of driving potential customers to our web site, where we have our names on several LISTSERVS that our customers voluntarily go on and support the product. … We have optimized, as much as we can, the searches on Google, for example, to drive [customers] to our web site."[71]

The evidence supporting the lack of any reported instances of confusion, namely applicant's product demonstrations and the Internet presence both parties maintain, as well as opposer's 75% market share, corroborate our previous finding on other evidence that the channels of trade and classes of consumers are different.

F. Balancing the factors.

Despite the similarities of the marks and the strength of opposer's mark, we find that the differences between the goods, channels of trade, and classes of consumers, as well as the sophisticated decision-making process in purchasing

---

[69] Goldsteen Testimony Dep., p. 31.
[70] Kullmann Discovery Dep., p. 56; Goldsteen Dep. Exhibits 3 and 13; Snider Testimony Dep., pp. 68 and 126, Exhibits 20, 32, 38 and 40.
[71] Goldsteen Testimony Dep., p. 34; see also Goldsteen Discovery Dep., p. 141. "LISTSERV" is "an automated mailing list distribution system" that users subscribe to exchange messages. net.speak: the internet dictionary, p.112 (1994).

and using the products at issue, warrant a finding that there is no likelihood of confusion.  In reaching this conclusion, we have carefully considered all of the evidence pertaining to the relevant *du Pont* factors, as well as all of the parties' arguments with respect thereto (including any evidence and arguments not specifically discussed in this opinion.

We find that there is not a practical likelihood of confusion; rather the extent of any possible confusion is *de minimis*.  Language by our primary reviewing court is helpful in resolving the likelihood of confusion controversy in this case:

> We are not concerned with the mere theoretical possibilities of confusion, deception or mistake or with de minimis situations but with the practicalities of the commercial world, with which the trademark laws deal.

*Electronic Design & Sales Inc. v. Electronic Data Systems Corp.,* 954 F.2d 713, 21 USPQ2d 1388,  1391 (Fed. Cir. 1992), *quoting Witco Chemical Co. v. Whitfield Chemical Co., Inc.*, 418 F.2d 1403, 1405, 164 USPQ 43, 44-45 (CCPA 1969).

**Decision**:   The opposition is dismissed with prejudice.

\*    \*    \*

Ritchie, Administrative Trademark Judge, dissenting:

The majority has determined that there is "no likelihood of confusion."  I disagree.  To explain why, I set forth my own analysis of the *du Pont* factors.

The majority has found opposer's VIGILANCE mark to be "strong." For the reasons set forth in the majority opinion, I agree that opposer's mark has achieved at least "niche market fame." I do not, however, agree that the majority has given this factor sufficient weight in its analysis. As we have been instructed by the Court of Appeals for the Federal Circuit, which we often refer to as our primary reviewing court, a strong mark, "casts a long shadow which competitors must avoid." *Kenner Parker Toys, Inc. v. Rose Art. Ins., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992). Thus, even if we were to consider only niche market fame, the onus was on applicant to avoid a similar mark that would be likely to cause confusion. This, I do not believe applicant has done.

The majority finds that the marks are "similar." Indeed they are effectively identical. Their appearance is almost entirely identical, with the clearly dominant section being the shared first seven letters, V-I-G-I-L-A-N-. The Federal Circuit has instructed that while we must not improperly dissect a mark, certain features may be considered dominant. *In re National Data Corp.,* 224 USPQ 749, 751 (Fed. Cir. 1985) ("[T]here is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in

their entireties."). I would expect that most consumers would not notice the difference in the final eighth letter in applicant's mark (versus the ninth and tenth in opposer's). As we have often stated, the question is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in their entireties that confusion as to the source of the goods or services offered under the respective marks is likely to result.

As acknowledged by the majority, the parties' marks have the same connotation and commercial impression. Indeed, as the record shows, there is even a dictionary entry showing "VIGILANZ" as the German translation of "VIGILANCE." (*Dictionary of Medicine English to German*, compiled by J. Nohring, p.689 (1984)).[72] Accordingly, I would find that the marks not only sound the same, but look the same, and mean the same thing. In short, they are for all purposes effectively identical.

As instructed by the Federal Circuit, the more similar the parties' marks, the lesser the degree of similarity between their goods necessary to support a finding of

---

[72] Thus even if we were to consider this as a "foreign equivalents" case, the words have the same meaning as well as an almost identical appearance. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1696 (Fed. Cir. 2005); *In re Spirits Int'l, N.V.*, 563 F.3d 1347, 90 USPQ2d 1489 (Fed. Cir. 2009).

likelihood of confusion. *In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1688-1689 (Fed. Cir. 1993); *In re Opus One Inc.*, 60 USPQ2d 1812 (TTAB 2001). It is only necessary that there be a viable relationship between their identified goods to support such a finding. *Id.* The issue is not whether consumers would confuse the respective goods, but rather whether consumers would be confused into believing that the goods are from the same source. *In re Rexel Inc.,* 223 USPQ 830 (TTAB 1984). This is particularly true where, as here, opposer enjoys the wide berth of protection accorded its (at least) niche fame, and the parties' marks are effectively identical.

It is axiomatic that we compare the goods as they are stated in the registration and the application, and not as they are used in the marketplace. Indeed, the Federal Circuit has been very specific about this. The second *du Pont* factor precisely asks us to consider "[t]he similarity or dissimilarity and nature of the goods or services <u>as described in an application or registration</u> or in connection with which a prior mark is in use." *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). (emphasis added)*; see also Octocom Systems, Inc. v. Houston Computers Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990). In *Octocom Systems*, the Court stated "[t]he authority is legion that the question of

registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods, the particular channels of trade or the class of purchasers to which the sales of goods are directed." (citing various cases). In that case, the Court affirmed the Board's decision not to consider an applicant's arguments regarding the market conditions of its product since they were not reflected in its identification of goods. As the Court stated:

> Thus, it was not error, as OSI argues, for the board to give no weight to OSI's evidence purporting to show that OCTOCOM modems are bought by a particular class of purchasers. It would have been error to do otherwise. Because OSI seeks an *unrestricted* registration, such evidence as there is of a specific class of customers did not relate to a *material* fact. (emphasis in original). *Id*. at 1787-1788.

Here, as well, I believe it is error on the part of the majority to give credence to applicant's argument that the market conditions are relevant where applicant seeks an *unrestricted* registration for its goods.[73] Nowhere does

---

[73] The majority relies on extrinsic evidence offered by applicant, citing *In re Trackmobile, Inc.*, 15 USPQ 2d 1152, 1154 (TTAB 1990). However, that case is inapposite since the majority does not actually rely on applicant's evidence to clarify that a term "has a specific meaning to members of the trade" *Id.* Rather, applicant here seeks only to show how it, specifically, understands the term "healthcare providers" as set forth in its

applicant's registration say that it is limited to use by pharmacists, nor does that limitation ring true. One could easily imagine this *unrestricted* registration including use by the same "healthcare providers" who administer opposer's "heart monitors," or even being used as a complementary product thereto. *See also Bose Corp. v. QSC Audio Products, Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1310-1311 (Fed. Cir. 2002) (affirming Board's decision not to consider evidence of different channels of trade where identification of goods in the application was unrestricted). With the effectively identical marks, and at least niche fame of opposer's mark, applicant should have stayed clear. I note again, the instructions of the Federal Circuit, to us, as well as to the parties, that a strong mark "casts a long shadow which competitors must avoid." *Kenner Parker Toys, Inc*, 22 USPQ2d at 1456.

Accordingly, unless otherwise restricted, the use by either party may be expanded from whatever it is currently to what is listed on their respective identifications of goods. Therefore, we must assume that what is listed on its identification, rather than what is argued by counsel on brief and at the oral hearing, is what is sought by applicant.

---

identification to refer to pharmacists only (to the exclusion of physicians) – a far-fetched argument indeed.

Although there is no clear definition of "healthcare provider" in the record, we need not be stuck with applicant's attenuated arguments that its system differs greatly from opposer's in that applicant's is used by pharmacists rather than physicians. In this regard, I would follow the lead of the Federal Circuit in taking judicial notice of well-known facts. *The BVD Licensing Corp. v. Body Action Design Inc.*, 846 F.2d 727, 6 USPQ2d 1719, 1721 (Fed. Cir. 1988). There, the Court stated: "Courts may take judicial notice of facts of universal notoriety, which need not be proved, and of whatever is generally known within their jurisdictions." (citation omitted) (finding B.V.D. to be a famous mark by judicial notice). Indeed, Judge Nichols filed a concurrence in that case specifically to endorse the use of judicial notice in Board decisions, noting: "Arguably, if the parties on both sides fail to offer evidence on a relevant point, they stipulate by implication that the court will decide it by judicial notice . . . I am pleased with the panel's reference to so undermentioned a rule."[74] *Id.* at 1722. As Judge Nichols pointed out, we

---

[74] Incidentally, Judge Nichols noted that "[w]ith so little at stake in the grant or refusal of a trademark or service mark registration, it is often not worthwhile to fill the record with proofs of every fact a court might wish to take into account." As to the amount at stake, I think most parties would take issue with his characterization, and as to the records, we have certainly seen them grow, and I do not believe that either the Federal Circuit or the Board wishes to see a further unwarranted increase. Rather, I agree with his next comment: "Judicial notice fills the gaps." Rather than stacking the record, parties

look to the Federal Rules of Evidence in determining that we may take judicial notice of facts "whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a). The Court further pointed out that the "territorial jurisdiction" of the Board is the entirety of the United States. The Federal Rules of Evidence state: "A court may take judicial notice, whether requested or not." Fed. R. Evid. 201(c). The rules further state that judicial notice may be taken "at any stage of the proceeding." Fed. R. Evid. 201(f).

The Federal Circuit teaches us not to confine use of judicial notice to dictionary definitions. *The BVD Licensing Corp.*, 6 USPQ2d at 1721. In another context, the Court simply took judicial notice of the meaning of the phrase "distal, middle, and proximal phalanges" as a generally-known fact. *Gart v. Logitech Inc.*, 254 F3d 1334, 59 USPQ2d 1290, 1296 (Fed. Cir. 2001). Although that was a patent litigation, I don't see any reason the rationale could not be applied to (trademark) Board proceedings, as the Federal Circuit has wisely cross-applied other doctrines between patent and trademark law. *See for example In re Bose Corp*, 580 F.3d 1240, 91 USPQ2d 1938 (Fed. Cir. 2009) (citing, on appeal from a (trademark) Board decision, among other cases, a federal district court case involving patent

---

may ask us to take judicial notice pursuant to the Fed. R. Evid. 201(c).

inequitable conduct*, Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366, 88 USPQ2d 1001 (Fed. Cir. 2008).

In the present case, I would take judicial notice of the fact "whose accuracy cannot reasonably be questioned" within our "territorial jurisdiction" that "healthcare providers," as set forth in applicant's identification, include physicians and nurses.[75] Accordingly, the clearly defined identification in the application of a system that "anticipates and detects adverse drug events" and "alerts healthcare providers," including physicians and nurses, may easily comprise, at the very least, viably similar if not complementary goods to opposer's VIGILANCE "heart monitors," which, being *unrestricted* in their identifications as well, could themselves be sold by prescription by the same pharmacists which applicant claims are doling out its VIGILANZ systems.[76]

I agree with the majority that we must rule on the record, and that opposer has the burden of proving its case at trial. However, I suggest that we must also use all

---

[75] I would, on the other hand, have a much harder time applying the definition of "healthcare providers" to "pharmacists" as applicant seems to do, in its practice if not its identification of goods.

[76] As the majority recognizes in footnote 63, there is nothing in oppposer's identification of goods that limits it from selling over-the-counter heart moniters. Neither is applicant restricted from selling via any channels of trade.

tools at our disposal.  This includes using the rules of construction, including looking at the plain meaning of the parties' respective identifications of goods.  This also includes, as instructed by the Federal Circuit and the Federal Rules of Evidence, implementing judicial notice where useful to our decision-making.

Moreover, in light of the majority's finding of niche fame, and of the identical nature of the marks, I believe there is substantial evidence in the record to support a finding of similarity of the goods between the parties. This is analgous to the situation in *Hewlett-Packard Press Co. v. Packard Press Inc.,* 281 F.3d 1261, 62 USPQ2d 1001 (Fed. Cir. 2002).  There, the Federal Circuit reversed the Board's dismissal of opposition where the Court found by "substantial evidence" a likelihood of confusion "as a matter of law" despite an assertion by the Board (as by the majority here) that opposer had not submitted sufficient evidence of the relatedness of the parties' goods and services.  The rationale of the Court was that the Board did not need to base its determination on such third-party evidence (or a lack thereof).  Rather, the Court directed the Board to make a direct comparison of "the services described in [applicant's] application with the goods and services described in [opposer's] registrations."  *Id.* at

52

1004. Thus, the Board must not overlook key evidence in the respective identifications themselves.

The majority has quoted some testimony from the record, which I excerpt here. In particular, when asked if Applicant's VIGILANZ system is "also designed to target physicians," Mr. Kullman responded, "Not primarily …" (Kullman Discovery Dep., p. 38). The majority also points out that Exhibit 21 to the Kullman deposition, an advertising flyer for applicant's system, shows the following:

> PHARMACY
>
> · Real-time analysis and reporting – data is always at your fingertips
>
> · No data entry required
>
> · Saves time by streamlining the gathering of information
>
> MEDICAL STAFF
>
> · Enhances clinically relevant pharmaceutical reports from pharmacy
>
> · Improves overall communication between the clinician and pharmacy

The issue before us is whether the goods and the channels of trade as identified by the *unrestricted* application and registration are likely to coincide. I think they do. Clearly pharmacists are not the only group targeted by applicant's advertising efforts. Mr. Kullman's "Not primarily " is a far cry from "No" and the listing of

53

"Medical Staff" equally with "Pharmacy" on Exhibit 21 indicates, rather, that multiple users are contemplated, including various "Medical Staff."

Both applicant's systems and opposer's heart monitors include goods that monitor information regarding patients' health and alert healthcare providers when attention is needed. Indeed, as pointed out by opposer, "the same adverse drug event may cause both the VIGILANCE heart monitor and the VIGILANZ computer system to issue an alert." (Opposer's brief at 41). Accordingly, on this record, I would find that the identification of goods in the application is at least viably related to that in the registration, along with the likely channels of trade.

I do not take issue with the majority's findings on the conditions of sale and sophistication of purchasers. With complicated and expensive systems that monitor patients' health, we would anticipate greater care on the part of the purchasers. As the Federal Circuit has noted, however, even sophisticated buyers are not immune from source confusion where, as here, the marks are effectively identical. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 948-949 (Fed. Cir. 2000).

In balancing the factors, then, I would find, as the majority has, that opposer has shown at least niche fame of its VIGILANCE mark for "heart monitors." With that, I would

54

find that opposer's mark should be accorded a fairly wide berth of protection.  I would also find that the parties have effectively identical marks.  I would find that applicant's identification of  "near real-time computer monitoring system comprised of a software application and database that anticipates and detects possible adverse drug events, and alerts healthcare providers to adverse drug events," is likely to be a viably similar if not complementary product to opposer's heart monitors, as shown by the parties' *unrestricted* identifications, in goods as well as channels of trade.  Although the consumers are likely to be sophisticated, and are shown to be so by the record, I think this would have little effect on source confusion given the effectively identical marks and the niche fame of opposer's mark on a similar good.  Finally, I would resolve what little doubt I may have for opposer as the undisputed senior user, as we must.  *In re Hyper Shoppes (Ohio), Inc.,* 837 F.2d 463, 6 USPQ2d 1025 (Fed. Cir. 1988); *Hewlett Packard Co. v. Packard Press Inc., supra,* 62 USPQ 1001 at 1003.

Accordingly, I would sustain the opposition and refuse registration to applicant.